**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
JUNIPER ENTERTAINMENT INC. and
JUNIPER SERVICES, INC.

Plaintiffs,

**REPORT AND**
**RECOMMENDATION**

- against -

CV 07-2413 (ADS) (AKT)

MICHAEL CALDERHEAD and JAMES
CALDERHEAD,

Defendants.
-------------------------------------------------------------X

## I.   INTRODUCTION

Plaintiffs Juniper Entertainment Inc. ("Juniper Entertainment") and its wholly owned

subsidiary Juniper Services, Inc. ("Juniper Services" and collectively with Juniper Entertainment,

"Juniper") commenced this action against former employees Michael Caldherhead and James

Calderhead (collectively "Defendants" or the "Calderheads") alleging breach of contract and

breach of fiduciary duty.  Compl. ¶¶ 1-3.  Judge Spatt granted Plaintiff's motion for a default

judgment based on Defendants' failure to appear as ordered and a default judgment was entered

against Defendants on April 11, 2011.  The matter was thereafter referred to me to conduct an

inquest to determine and recommend what damages, if any, are appropriate, including any costs

and attorney's fees.  *See* DE 111.

## II.   BACKGROUND

### A.     The Parties' Relationship

James Calderhead was hired by Juniper Entertainment in 2005 as an "Executive"

pursuant to the terms of an engagement agreement (the "Employment Agreement").

Compl. ¶¶ 10-11.  After he was hired, James Calderhead identified a wireless communications

company, New Wave Communication Inc. ("New Wave") as an acquisition target for Juniper.

*Id*. ¶13.  At that time, New Wave was an Indiana-based wireless communications contractor

specializing in, among other things, tower construction and maintenance.  *Id*. ¶ 14.  New Wave

was partially owned by James Calderhead's brother, Michael Calderhead.  *Id*. ¶ 13.  In order to

facilitate the acquisition, a stock exchange agreement was entered into by various parties,

including Michael Calderhead and Juniper Services (the "Stock Exchange Agreement").  *Id*.

¶ 16.  Pursuant to the Stock Exchange Agreement, Michael Calderhead and the other sellers

received cash and stock of Juniper Group, the publicly traded parent corporation of Juniper

Services and Juniper Entertainment.  *Id*.  After the acquisition, Michael Calderhead became an

employee of New Wave and James Calderhead was named President of New Wave.  *Id*. ¶ 17.

On or about January 17, 2007, ten months after the close of the sale of New Wave,

Michael Calderhead announced that he would resign from New Wave, but the relationship did

not formally end until on or about March 20, 2007.  *Id*. ¶ 28.  Thereafter, on March 24, 2007,

Michael Calderhead's brother, James Calderhead, was terminated from New Wave for cause.  *Id*.

¶ 36.

New Wave ultimately filed for bankruptcy in 2008.  *See* Transcript of the October 27,

2011 Inquest Hearing ("Tr.") at 47-48 .[1]

## B.    The Complaint

On June 15, 2007, Plaintiffs filed their Complaint, asserting three causes of action: (1)

breach of a stock exchange agreement by Michael Calderhead; (2) breach of an employment

---

[1]      Subsequent citations to the transcript of the Inquest Hearing are referred to as
"Tr. at ___ ."

agreement by James Calderhead; and (3) breach of fiduciary duty by both Calderheads.  DE 1.

Juniper alleges that in violation of their respective agreements, both of which contained

restrictive covenants, the Calderheads surreptitiously formed and operated a competitor company

to New Wave, namely, Communications Infrastructure, Inc. ("CII").[2]  The Calderheads allegedly

diverted time and resources away from New Wave to CII during the time when they were

employed by New Wave.  For example, the Complaint states that the Calderheads purchased

equipment on behalf of New Wave and then used that equipment to set up CII.  Compl. ¶ 24.

Plaintiffs claim that as a result of the Calderheads' unlawful activities, New Wave

experienced substantial declines in its business.   Plaintiffs further allege that James Calderhead,

while acting as President of New Wave, misled Juniper about the financial stability of New

Wave in order to conceal the fact that the Calderheads were competing with New Wave.

Moreover, in May 2007, ten employees abruptly left New Wave on the same day and some of

them began to work for CII.  According to the Plaintiffs, at or around this time, vital proprietary

information and significant projects disappeared from New Wave and New Wave was on the

verge of financial collapse.

### C.    Preliminary Injunction Hearing

Plaintiffs moved for injunctive relief before District Judge Spatt on June 20, 2007.

Specifically, Plaintiffs sought an order preliminarily enjoining the Calderheads from directly or

indirectly competing with New Wave through, *inter alia*, the solicitation of its clients or inducing

its employees to leave.  On June 22, 2007, Judge Spatt signed Plaintiff's Order to Show Cause

---

[2]    Although Michael Calderhead's contract was with Juniper Services and James
Calderhead's contract was with Juniper Entertainment, for ease of reference, this Order refers to
both entities as either "Juniper" or "Plaintiffs."

for a preliminary injunction, including a modified temporary restraining order consented to by the

Defendants, pending a hearing set for July 2, 2007.  DE 5.  The matter was referred to me by

Judge Spatt to conduct the hearing and to report and recommend what action, if any, should be

taken after having reviewed Plaintiffs' papers and having conducted the necessary evidentiary

hearing.  *Id*.

      This Court conducted a hearing on the preliminary injunction motion on July 9, 2007

during which the parties introduced testimony and evidence.  Based on the evidence submitted,

the Court concluded that Juniper/New Wave had established that the business would suffer

irreparable harm without a preliminary injunction against Michael Calderhead and also that the

Plaintiffs had established a likelihood of success on the merits of certain claims. Moreover, even

if Plaintiffs had not established a likelihood of success, the Court concluded that Plaintiffs clearly

established sufficiently serious questions going to the merits of their claims to make them a fair

ground for litigation, and that a balance of the hardships tipped decidedly in the Plaintiffs' favor.

Accordingly, I recommended to Judge Spatt that a preliminary injunction be issued enjoining

Michael Calderhead from: (1) disclosing any of the trade secrets or confidential information of

Juniper/New Wave; and (2) soliciting, directly or indirectly any of Juniper/New Wave's

customers whose names and contact information appeared on a Juniper/New Wave customer list,

Defendants' Exhibit D from the July 9, 2007 hearing.  DE 16.

      I did not recommend that an injunction be entered against James Calderhead because

Plaintiffs did not offer any proof that James Calderhead was working for CII or otherwise acting

in a manner inconsistent with his duties to his former employer.  *Id*. at 75-82.

      On September 19, 2007, Judge Spatt adopted this Court's Report and Recommendation

4

with regard to James Calderhead, to which there were no objections, and vacated the temporary restraining order against him.  DE 29.  Thereafter, Judge Spatt reviewed the Defendants' objections to the Report and Recommendation with regard to Michael Calderhead and ultimately granted the relief recommended.  DE 31.

### D.     Defendants' Default

Defendants were originally represented by Bracken, Margolin & Besunder, LLP, but in June of 2008, Judge Spatt granted that firm's motion to withdraw as counsel and gave Defendants thirty (30) days to retain new counsel.  DE 66.  Defendants were unable to obtain new counsel during that time period and moved forward representing themselves as they sought to engage counsel.  *See* DE 67 ¶ 1.  During a status conference before this Court in August 2008, the Court provided Defendants with suggestions for how to obtain new counsel.  *See id.* ¶ 4.

At the next status conference, held in September of 2008, James Calderhead reported that he had been receiving some assistance from an attorney in Tennessee, but that attorney would not be appearing in the case.  *See* DE 68 ¶ 1.  The Court made it clear to Defendants that regardless of whether they were able to secure counsel, they were obligated to comply with the Court's scheduling orders, including the Court's August 14, 2008 Order directing Defendants to complete certain discovery tasks, which they had not done.  The Court advised Defendants that they would have one final opportunity to comply with the obligations set forth in the August 14, 2008 Order and warned that if they did not do so by November 3, 2011, Defendants risked a finding of default.

At a status conference on December 1, 2009, the Court spent time explaining the summary judgment process to the Defendants who were still proceeding *pro se*, and urged them

5

to confer with the Pro Se Office here in the Courthouse for  procedural guidance, including a discussion of Judge Spatt's Individual Practice Rules regarding motion practice.  DE 88.

In early 2010, Defendants obtained new counsel, Jonathan L. Stein, who filed a Notice of Appearance on January 5, 2010.  *See* DE 94.  At the first conference in which new counsel appeared, the Court informed Attorney Stein that during virtually every conference conducted with Defendants since their original counsel was permitted to withdraw almost twenty (20) months prior, the Court had urged them to obtain new counsel.  *Id*.  The Court also informed Attorney Stein that the Calderheads had been consistently given additional consideration by the Court based on their pro se status.  *Id*.  During the time he represented the Defendants, Attorney Stein filed two motions for extensions of time to complete discovery, the first of which was denied, while the second was granted.  *See id.*; DE 97.  Attorney Stein also served a request for production of documents, which the Court permitted notwithstanding Plaintiffs' objections based on untimeliness.  DE 98.  In June of 2010, Attorney Stein requested leave to withdraw on the grounds that the Calderheads had ceased all communication with him and had incurred substantial debt which remained unpaid.  *See* DE 102.  The request was granted by Judge Spatt on July 29, 2011.  *See* DE 108.

In the July 29, 2011 Order granting Attorney Stein's withdrawal, Judge Spatt directed the Defendants to appear either *pro se* or through counsel within thirty (30) days of receiving notice of the Order.  Judge Spatt further warned that failure to comply with this directive could result in a default being entered against the Calderheads.  *See* DE 111.  Defendants failed to comply with this directive and, thereafter, upon Plaintiffs' motion, Judge Spatt entered a default judgment against both Calderheads.  *See id.*

6

After Judge Spatt referred the matter for an inquest, this Court issued an Order on

July 22, 2011 directing Plaintiffs to provide certain documentation and support for their damages

claim, including a breakdown of the categories of damages and case law supporting those claims.

DE 114.  This Order was served on the Defendants on July 28, 2011, *see* DE 115, and the

Calderheads were given an opportunity to submit opposition papers, *see* DE 114.  Plaintiffs

submitted an attorney affirmation and various documents to support their claims, including one

spreadsheet entitled "Statement of Operations," other spreadsheets reflecting legal fees incurred

by Plaintiffs, copies of legal bills, the contracts with Defendants, and various contracts between

New Wave and its customers.  *See* August 12, 2011 Attorney Affirmation of John Lerner in

Response to Order Dated July 22, 2011 ("Lerner Aff.") [DE 116].  Defendant James Calderhead

submitted opposition in the form of an affirmation asking the Court to deny all damages.  *See* DE

117.  Michael Calderhead did not submit any responding opposition.   The inquest hearing was

held on October 27, 2011 (the "Inquest Hearing") during which both sides introduced

documentary evidence.  Vlado Hreljanovic, an employee of Juniper Group and CEO of Juniper

during the time Defendants were employed by New Wave, testified on behalf of the Plaintiffs.

Defendants did not testify, although they were advised of their right to do so in advance of the

hearing and were given multiple opportunities to do so during the hearing.  DE 114; *see* Tr. at 5,

6, 11-13, 95, 104-105, 126, 131-32.  In fact, prior to any testimony being taken during the Inquest

Hearing, the Court engaged in the following exchange with the Defendants:

| | |
|---|---|
| THE COURT: | Let me ask James Calderhead first: Is it your desire to testify today? |
| J.  CALDERHEAD: | Well, I believe like Mr. Lerner, I'm here to answer questions that the Court may have as it |

7

pertains to this document [Pls.' Ex. A], which is no different than – I think I heard you saying Mr. Lerner is able to speak to some of the things that he put in this document to clear up for the Court's eyes.

THE COURT:          He's going to do that in the context from testimony from his client, because an affidavit is not sufficient for the purposes of today.

This is your one and only opportunity to defend the damages in this case.  If you wish to testify and have that admitted as your evidence, I'm happy to do that.  I'll let you testify in a narrative form in response to what you've heard from Mr. Hreljanovic to dispute what he's saying, but it will be either sworn testimony, just as his will be sworn testimony, or it doesn't carry the same weight.  I hope you understand that.

I'm not compelling you to testify.  I'm just trying to explain to you, you have a right to testify, to refute these damages.  Whether you do or don't is entirely your decision.

J. CALDERHEAD:      No, I think I do understand your Honor.  And I think where I'm at is, I do not believe there is enough proof in the documents that are provided, and the only way to do it is to have Mr. Hreljanovic on the stand.

And he didn't put it in writing, so, therefore, what I'm saying is I object to that now.

So I'm cautioning you myself to not open that door and allow for that to happen, because I do not believe the documents stand on their own.

THE COURT:          This is an evidentiary hearing.  It is a little less formal than a trial.  And despite the fact that the request was not made to me in advance, it

8

doesn't mean I can't, in my discretion allow people to testify.

And because I don't have sufficient information here on either side, I'm going to allow people to testify.

The question for you is: Do you want to testify?

Whether you testify or not, you have a right to cross-examine Mr. Hreljanovic. When he finishes his direct testimony, you can certainly cross-examine him.

The question is whether you wish to testify under oath to dispute some of what you've heard from Mr. Hreljanovic in his direct examination.

J. CALDERHEAD:    Then, with that being said, may I reserve the right to do that until after that?

COURT:            Yes, you may.

J. CALDERHEAD:    That is my wish, please.

COURT:            Michel Calderhead, what is your wish?

M. CALDERHEAD:    I wish to reserve the right to testify after Mr. Hreljanovic testifies.

Tr. at 11-13. Just prior to the Court's redirect of Vlado Hreljanovic, the Court again inquired whether either of the Calderheads intended to testify and present a defense. *Id*. at 126. James Calderhead asked to reserve his answer until he heard the re-direct of Mr. Hreljanovic and I granted that request. *Id*. There was no further cross-examination and Mr. Hreljanovic was excused, at which point the Plaintiffs rested. When the Court inquired again at that time whether James Calderhead or Michael Calderhead intended to introduce any testimony, including their

9

own, they both declined to do so.  *Id*. at 131-32.  At the conclusion of the hearing, the Court

spent time explaining to the parties that they could submit post-hearing briefs setting forth what

they believed the evidence showed.  *Id*. at 136-37.  A briefing schedule was then set and both

sides submitted additional briefing.  *See* Pls.' Mem. [DE 122]; Defs.' Mem. [DE 124] .

## III.   LEGAL STANDARD

A default constitutes an admission of all well-pleaded factual allegations in the complaint

and the allegations as they pertain to liability are deemed true.  *Joe Hand Promotions, Inc. v. El*

*Norteno Restaurant Corp.*, No. 06-CV-1878, 2007 WL 2891016, at *2 (E.D.N.Y.  Sept. 28,

2007) (citing *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir.

1992), *cert. denied*, 506 U.S. 1080 (1993)).  A default judgment entered on the well-pleaded

allegations in the complaint establishes a defendant's liability.  *See Garden City Boxing Club,*

*Inc. v. Morales*, No. 05-CV-0064, 2005 WL 2476264, at *3 (E.D.N.Y. Oct. 7, 2005) (citing

*Bambu Sales, Inc. v. Ozak Trading, Inc.*, 58 F.3d 849, 854 (2d Cir. 1995)).  The only question

remaining, then, is whether Plaintiffs have provided adequate support for the relief they seek.

*Greyhound Exhibitgroup, Inc.*, 973 F.2d at 158.  The moving party need only prove "that the

compensation sought relate[s] to the damages that naturally flow from the injuries pleaded."  *Id.*

at 159.  The moving party is entitled to all reasonable inferences from the evidence it offers.  *Au*

*Bon Pain Corp. v. Arctect, Inc.,* 653 F.2d 61, 65 (2d Cir. 1981).

## IV.   DISCUSSION

Preliminarily, a brief discussion concerning the scope of the Court's inquiry is warranted.

The majority of the opposition filed by James Calderhead prior to the Inquest Hearing is devoted

to either James Calderhead's liability or the fact that he did not have the financial resources to

hire counsel to properly defend him.  *See* DE 117.  Similar statements were made in the post-hearing memorandum filed by Defendants.  *See* Defs.' Mem.  As the Court previously advised the Defendants, these issues are not properly before the Court during an inquest.  By virtue of the Defendants' default, which was noted in the record of this case on April 13, 2011, the liability issues have already been determined and liability has been entered against Defendants on all of Plaintiffs' claims.  That issue is not within the scope of the referral to this Court for the inquest. As to Defendants' lack of counsel, the Court notes that a defendant's *pro se* status does not excuse the failure to comply with court orders, *see Agiwal v. Mid Island Mortgage Corp.*, 555 F.3d 298, 302 (2d Cir. 2009); *Livecchi v. U.S. Dep't of Housing and Urban Dev.*, 153 Fed. Appx. 16, 17 (2d Cir. 2005); *Todtman Nachamie, Spizz & Johns, P.C. v. Ashraf*, 241 F.R.D. 451, 454 (S.D.N.Y. 2007), *aff'd by*, 316 Fed. Appx. 51 (2d Cir. 2009), and both Defendants were specifically advised that a lack of counsel would not excuse compliance with Court Orders.  *See* DE 68 ¶ 2.  That lack of compliance ultimately resulted in the granting of the default judgement.

Turning now to the merits, Plaintiffs seek the following categories of damages: 1) New Wave's lost profits for the years 2007 through 2010; 2) New Wave's net losses for the years 2007 through 2008 prior to its filing for bankruptcy; 3) damages associated with the destruction of the New Wave business including capital Plaintiffs had to invest in New Wave after Defendants left, equipment seized as a result of New Wave's bankruptcy, and attorney's fees for New Wave's bankruptcy counsel; 4) attorney's fees accrued in this action; and 5) punitive damages.

Prior to the Inquest Hearing, Plaintiffs sought an additional category of damages described as "Accounts Receivable collected by defendants and never remitted to plaintiffs"

11

which Plaintiffs claimed consisted of "monies owed to the plaintiffs at the time of the acquisition [that were] received by defendants and converted to their own use without the plaintiffs' authority." Lerner Aff. ¶ 3.b.  At the Inquest Hearing, however, when questioned by counsel, Mr. Hreljanovic stated that ". . . based on discussions today, I think that the accounts receivable and the unbilled receivables, I will waive my rights." Tr. at 60-61.  That category of damages is therefore eliminated.

### A.    Lost Profits

Plaintiffs seek $4,478,422 for New Wave's lost profits for the years 2007 through 2010. Because it is unclear whether Plaintiffs are seeking lost profits in connection with their breach of contract claims or their breach of fiduciary duty claims, the Court addresses both.

### 1.    Breach of Contract Claims

"Under New York law, the measure of damages for violation of a restrictive covenant is the loss sustained by reason of the breach, including the net profits of which the plaintiff was deprived by the defendant's acts." *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, __ F. Supp. 2d. __ , No. 08-CV-4810, 2011 WL 4035751, at *20 (S.D.N.Y. Sept. 12, 2011) (collecting cases) (internal quotations removed).[3]  Lost profit damages may be awarded only if: (1) it can be demonstrated with certainty that the damages were caused by the defendant's breach; (2) the alleged loss is capable of proof with reasonable certainty; and (3) lost profit damages were fairly within the contemplation of the parties at the time of contracting." *Kenford Co. v. County of Erie*, 67 N.Y.2d 257, 261, 502 N.Y.S.2d 131 (1986).  Lost profit "damages may

---

[3]    The Stock Exchange Agreement is governed by the laws of the State of New York.  Lerner Aff., Ex. F § 10.3.  The Employment Agreement is governed by the laws of the State of New York without respect to its conflicts of law rules.  *Id.*, Ex. G § 15.7.

not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes." *Id.*; *accord Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*, 487 F.3d 89, 109-10 (2d Cir. 2007) (noting that the burden of proof for consequential damages such as lost profits is higher than the burden of proof for general damages).

### a.       *Causation of Lost Profit Damages*

Plaintiffs have not met their burden of establishing that Defendants caused New Wave to lose the profits Plaintiffs seek to recover.  In cases similar to this one, courts require some showing that the damages sought were actually caused by the defendants' diversion of business. *See Spherenomics Global Contact Ctrs. v. vCustomer Corp.*, 427 F. Supp. 2d 236, 250-52 (E.D.N.Y. 2006) (denying claim for lost profits associated with breach of non-solicitation agreement where the plaintiff could not establish that the defendant's breach caused it to lose a customer account); *Shred-It USA, Inc. v. Bartscher*, No. 02-CV-4082, 2005 WL 2367613, at *12 (E.D.N.Y. Sept. 27, 2005) (refusing to award lost profits where record lacked evidence that defendants caused client to terminate its relationship with plaintiff).

As the Court explained in the Report and Recommendation on the Preliminary Injunction motion, normally, in cases such as this one involving purported violations of a restrictive covenant or breach of an employee's duty of loyalty, a plaintiff presents affidavits or direct testimony from a customer or fellow employee solicited by the defendant.  *See, e.g.*, *Global Switching Inc. v. Kasper*, No. 06-CV-412,  2006 WL 1800001, at *6 (E.D.N.Y. June 28, 2006) (testimony by defendant's co-worker that defendant encouraged him to startup a competing business while working for plaintiff); *S. Nassau Control Corp. v. Innovative Control Mgmt.*

13

*Corp.*, No. 95-CV-3724, 1996 WL 496610, at *3 (E.D.N.Y. June 20, 1996) (fellow co-worker of

defendant testified that while working for plaintiff he was encouraged by defendant to work for a

competing business owned by defendant's brother); *Doubleclick, Inc. v. Henderson*, 1997 WL

731413, at *2 (N.Y. Sup. Ct. N.Y. County Nov. 7, 1997) (affidavit from employer that following

the confiscation of defendant's laptop information retrieved from the hard drive showed save e-

mails messages, business plan drafts and other strategic documents demonstrating the business

plan to setup competitor company).   At the time of the Preliminary Injunction Hearing, Plaintiffs

had not presented evidence that either of the Defendants improperly solicited New Wave

customers.  DE 16 at 55, 77.

Although Plaintiffs conducted some discovery after the Preliminary Injunction Hearing

(*see* DE 72, 91), Plaintiffs still have not established that Defendants improperly diverted any

business from New Wave.  Although the Lerner Affirmation attaches several contracts which

Plaintiffs' counsel states were "lost and/or substantially impacted by the defendants' actions," *see*

Lerner Aff. ¶ 7c-m, the attorney's statement is not based on personal knowledge and is not

supported by any evidence.  At the Hearing, Mr. Hreljanovic referenced clients that New Wave

purportedly lost due to Defendants' activities, but when the Court asked what evidence Plaintiffs

had that the clients were lost because of the Calderheads' conduct, the only client Mr.

Hreljanovic could name was Sprint:

> MR. HRELJANOVIC:   The major client that we had in that period
> was Sprint.  And Michael Calderhead and the
> gentleman that was representing Sprint were
> very close friends.  They vacationed together
> a number of times.  That was our first account
> that disappeared.  We lost that account.  We
> got no more business from Sprint.   When

14

|  |  |
|---|---|
|  | Michael Calderhead left, the business evaporated. |
| MR. LERNER: | Did you ever talk to anybody at Sprint? |
| MR. HRELJANOVIC: | We tried to speak to people at Sprint. We made a number of calls. We e-mailed. We got no response from them. |
| MR. LERNER: | Did you speak to any of these clients that you say you lost from New Wave because of the Calderheads? Did you speak to any of them? |
| MR. HRELJANOVIC: | Yes, I spoke to two individuals. I believe one was in Tennessee and one was in Indiana. Or we did – I personally spoke to two people yes. |
| THE COURT: | What did you learn from that? |
| MR. HRELJANOVIC: | They told us they didn't have any more business. They knew that – at that time I believe that Mike Calderhead and Jim Calderhead were working for CII, and they had Sprint business and we didn't. |
| J. CALDERHEAD: | I object, your Honor. |
| THE COURT: | It sounds to me that this is an assumption you are making. Nobody told you in these conversations: This is what I need to understand. Nobody told you in these conversations that they left you in order to go over to CII. Is that the business you are talking about? |
| MR. HRELJANOVIC: | That's correct. You are correct. |
| THE COURT: | So these are inferences you are drawing, correct? |
| MR. HRELJANOVIC: | That is correct. |

\*      \*      \*

15

|  |  |
|---|---|
| THE COURT: | . . . Did you get any statement from anybody? |
| MR. HRELJANOVIC: | No. |
| THE COURT: | So what I have right now from what you are telling me, these are inferences you are drawing or assumptions you are making based on the fact that you lost x number of customers? |
| MR. HRELJANOVIC: | That's correct. |

Tr. at 18-20.

On cross-examination, Mr. Hreljanovic also identified a company called Crown Castle as a lost customer. *Id.* at 88.   Mr. Hreljanovic had no evidence that New Wave lost any customer accounts due to Defendants' activities and conceded that the only basis for his belief that New Wave lost the Sprint account was the fact that Michael Calderhead was friends with somebody at Sprint and had vacationed with that person. *Id.* at 18-20. This speculation is an insufficient basis for concluding that Defendants caused New Wave to lose all of its profits for the years 2007 through 2010.

The Plaintiffs are charged with the burden of establishing their entitlement to recovery of damages.  *See E-Centurion, Inc. v. Long Beach Co.,* No. 06-CV-5913,  2007 WL 2815689, at *1 (E.D.N.Y. Sept. 25, 2007).   At the beginning of the inquest, the Court cautioned Plaintiffs as follows:

> The only question remaining here, then, for purposes of this hearing is whether the plaintiff has provided adequate support for the relief he seeks.  Or I should say "they seek," since we have two plaintiffs.  In addition, I note there are two defendants here, and the damages at issue have to be proven individually with respect to each defendant.

Tr. at 9.  The Court notes that Plaintiffs made no attempt during the inquest to apportion the

16

responsibility for the lost profits between Michael Calderhead and James Calderhead.  Michael

and James Calderhead had different roles within New Wave and the circumstances surrounding

their departure and conduct thereafter differ.  Mr. Hreljanovic testified, without elaboration, that

both Defendants were equally responsible for the lost profits.  Tr. at 57-59.  This conclusory

statement is not a sufficient basis for finding that each Defendant caused the lost profits Plaintiffs

are seeking.

In sum, there is no evidentiary basis for concluding that Defendants' breaches of their

respective agreements caused New Wave to lose over four million dollars in profits from 2007

through 2010.

### b.    *Reasonable Certainty of Lost Profits*

Plaintiffs also fail to calculate their lost profits with any reasonable certainty.  In support

of their request, Plaintiffs initially submitted an unauthenticated, one page "Statement of

Operations" annexed to Attorney Lerner's Affirmation which was filed prior to the Inquest

Hearing.  Lerner Aff., Ex. A.  The document reflects Plaintiffs' contention that New Wave's

Projected Net Income for 2007 through 2010 would have totaled $4,478,422.00.  This projection

is based on the continued trend of the twenty percent growth rate Plaintiffs claim New Wave

experienced from 2004 through 2006.  *Id.* ¶ 4.a.

The Court initially notes that at the Inquest Hearing, Mr. Hreljanovic testified about a

document called the "Statement of Operations," which was identified as Pl's. Ex. 1, as well as a

similar updated spreadsheet, Pl's. Ex. 2.  Neither of these documents was ever entered into

evidence.  This appears to have been an inadvertent oversight by counsel.  Notwithstanding that

fact, and for the following reasons, the Court would not have admitted these documents into

17

evidence.

First, Plaintiffs failed to lay a proper foundation.  Mr. Hreljanovic initially testified that

he prepared the Statement of Operations with the assistance of his comptroller to establish the

Plaintiffs' damages in this case.  Tr. at 17, 25, 28.  Later, when pressed to respond on cross-

examination whether anyone with knowledge of the wireless industry assisted in its preparation,

Mr. Hreljanovic said that he was assisted by a consultant, Philip Barak, *id*. at 124-25.  The

Plaintiffs did not call the consultant to testify during the Inquest Hearing.  The updated Statement

of Operations was, by Mr. Hreljanovic's own admission, prepared recently, and apparently not

kept in the regular course of business.  *See id*. at 25-26.

Moreover, although Mr. Hreljanovic testified that the basis for the figures for the years

2004 through 2006 came from the audited financial statements of New Wave for the years 2004

and 2005, Pls.' Ex. 3, and the Form 10-KSB filed by Juniper Group with the Securities and

Exchange Commission for the year 2006, Pls.' Ex. 4[4], *see* Tr. at 34-40, the numbers in those

documents do not match up with the numbers in the Statement of Operations.  For example, the

"Income from Operations" in the Statement of Operations is $669,000 for 2005, but the audited

financial statement reflects that the Income from Operations was $223,418, *see* Pls' Ex. 3 at 4.

Moreover, the "Gross Profit" listed on the Statement of Operations is $1,445,000 for 2005, but

---

[4]      In response to the Court's confusion as to why Plaintiffs were relying on the
Juniper Group filings (as opposed to New Wave documents), Mr. Hreljanovic testified that
"Juniper Group is just a holding company.  All revenue that is generated is 100 percent – every
dollar of revenue is New Wave."  Tr. 47.  The "Description of Business" section of the filings
reveals otherwise and explains that a small portion of Juniper Group's revenue comes from
motion picture distribution.  *See* Pls.' Ex. 4 at 2-3; Pls.' Ex. 5 at 6.  Indeed, in 2007, Juniper
Group took a charge of $20,673 related to its motion picture distribution business.  This
discrepancy further calls into doubt the accuracy of the Statement of Operations.

18

the audited financial statement reflects that Gross Profits were $1,144,855, *see* Pls.' Ex. 3 at 4.

For these reasons, the Court does not rely on either version of the Statement of Operations.  *See*

*Billion Tower Int'l, LLC v. MDCT Corp.*, No. 08-CV-4185, 2010 WL 5536513, at *9 (S.D.N.Y.

Dec. 10, 2010) (declining to award lost profits damages in inquest where the plaintiff submitted

only two charts containing projected sales, costs, and profits, but failed to submit any

substantiation for the numbers contained therein).

 Putting aside the issue of the admissibility of the Statement of Operations and assuming

that the figures reflected there for 2004 through 2006 are accurate, Plaintiffs still did not establish

that the lost profits calculations, which are based on twenty percent (20%) growth during each of

the four years at issue, are reasonably certain.  Plaintiffs argue that twenty percent (20%) is a

reasonable rate because New Wave experienced a growth trend of twenty percent (20%) from

2004 through 2006.  *See* Lerner Aff. ¶ 4.a.  Plaintiffs explain that this is based on the

"approximate twenty percent (20%) increase" in total revenues for 2006 over the prior year.  *See*

Pls.' Mem. at 7.  First, the increase was actually closer to sixteen percent (16%) than twenty

percent (20%) (i.e., the difference between the 2006 total revenue of $4,681,000 and 2005 total

revenue of $4,027,000 is $654,000, which is approximately 16.24 % of the 2005 revenue).

Second, the total revenue actually decreased from 2004 to 2005 and Plaintiffs fail to account for

this in their projected trend.  And finally, total revenue is only one variable in a profit calculation.

Indeed, the "Income from Operations" line on the Statement of Operations, which Plaintiffs seem

to interpret as the measure of profit was $354,000 in 2004, $669,000 in 2005 (or $223,418

according to the audited financial statement), and $389,000 in 2006 – far from a steady twenty

percent (20%) growth trend.

Even if New Wave did have an established twenty percent (20%) annual growth trend, Plaintiffs have not demonstrated any basis for assuming that New Wave's profits in 2007 through 2010 would continue at the growth rate experienced from 2004 through 2006. As the Second Circuit has cautioned, "the entrepeneur's cheerful prognostications are not enough" to establish lost profits with the requisite certainty. *Schonfeld v. Hilliard*, 218 F.3d 164, 173 (2d Cir. 2000) (internal alterations and quotations omitted). Moreover, historical profit margins do not provide a sufficient basis for determining profits going forward. *See Millenium Expressions, Inc. v. Chauss Marketing, Ltd.*, No. 02-CV-7545, 2007 WL 950070, at *7 (S.D.N.Y. March 30, 2007) (rejecting claim for lost profits that was based solely on past performance); *Dupont Flooring Systs., Inc. v. Discovery Zone, Inc.*, No. 98-CV-5101, 2005 WL 22865, at *1 (S.D.N.Y. Jan. 5, 2005) (striking expert report in connection with lost profits claim because it was based on unfounded assumptions that plaintiff's EBITDA numbers in 1998 would match those in 1997). For example, in *Adams v. Lindblad Travel, Inc.*, 730 F.2d 89 (2d Cir. 1984), the Second Circuit declined to award lost profit damages based on past results, holding that even if the defendants fulfilled their contractual obligations, there was "no reason to believe that such would have guaranteed [the plaintiff] the same success he enjoyed two years earlier" because "too many variables, apart from the breach, could have caused a discrepancy between" the two years. *Id.* at 92.

In this case, many variables could have affected New Wave's profits in the 2006 through 2010 period. Defendants point to the country's economic downturn, changes in the wireless industry, such as the mergers of Sprint and Nextel and AT&T and Cingular, and Plaintiffs' mismanagement as potential intervening causes of New Wave's lost profits. *See* DE 117 at 2-5;

20

Tr. at 90-92; Defs.' Mem. at 2-5.  Although Defendants did not introduce testimony or documentary evidence to support these arguments, the Form 10K and Form 10-KSBs filed by Juniper Group and entered into evidence at the Inquest Hearing reflect similar concerns about the economic downturn and changes in the industry – factors which have nothing to do with the Calderheads' conduct.  *See* Pls.' Ex. 5 at 7-11; Ex. 6 at 4-8.

The Court also has concerns that Juniper was operating a business similar to New Wave during the years they were claiming Defendants caused New Wave to lose profits -- another potential cause of New Wave's poor performance.  At the Hearing, Mr. Hreljanovic testified that Juniper was operating another subsidiary, Ryan Pierce, that did "similar work as NewWave used to do, but the difference is that they don't do it in one region.  NewWave was strictly an Indiana-based company.  Ryan Pierce operates in Tennessee, Carolina, which is not what New Wave did." Tr. at 114.  The 2007 Juniper Group 10-KSB, however, lists both North Carolina and Tennessee as regions where New Wave provided services and further states that New Wave could provide services "anywhere within the United States."  Pls.' Ex. 5 at 4.

Without speculating as to what New Wave's profits would have been from 2007 through 2010 absent Defendants' conduct, the Court finds that Plaintiffs have not met their burden of demonstrating that New Wave would continue to experience twenty percent (20%) annual growth (if it ever did).  *See Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1579 (2d Cir. 1994) ("Fixing lost profits damages with reasonable certainty requires careful examination of the nature and reliability of the statistical proof."); *Homkow v. Musika Records, Inc.*, No. 04-CV-3587, 2009 WL 721732, at *10-12 (S.D.N.Y. March 18, 2009) (refusing to award lost profits even though expert opinion proffered where calculation was speculative);

*Shred-It USA*, 2005 WL 2367613, at *12 (holding that unsupported aggregate estimates were insufficient to support claim for lost profits).

### c.        Contemplation of the parties

The final element is whether lost profits damages were contemplated by the parties. Where, as here, the contract is silent on lost profits damages, the Second Circuit has held that "the court must take a 'common sense' approach, and determine what the parties intended by considering 'the nature, purpose and particular circumstances of the contract known by the parties . . . as well as what liability the defendant fairly may be supposed to have assumed consciously.'"  *Schnofeld*, 218 F.3d at 172 (citing *Kenford*, 73 N.Y.2d 312).  Here, Plaintiffs have not introduced any evidence of circumstances that would suggest that lost profits damages were contemplated by the parties.  Instead, they make the conclusory statement that "it is irrefutable that . . . [lost profit] damages were fairly within the contemplation of the parties at the time" the relevant agreements were executed.  *See* Pls.' Mem. at 9.  This is an insufficient basis to conclude that the parties contemplated lost profits damages.  And even if some lost profits damages were contemplated, Plaintiffs fail to justify their claim for lost profits for four years after the Defendants left New Wave.  In their post-hearing memorandum, Plaintiffs argue for the first time that lost profits are recoverable as "special" or "consequential" damages, citing *East Coast Resources, LLC v. Town of Hempstead*, 707 F. Supp. 2d 401 (E.D.N.Y. 2010).  Pls.' Mem. at 6.  In addition to being untimely, the Court finds this argument unpersuasive as labeling the damages "special" or "consequential" does not change the Court's analysis.  *See Tractabel Energy Marketing, Inc.*, 487 F.3d at 109 (explaining that lost profits are a type of consequential damages).  Thus, the Court finds that Plaintiffs cannot satisfy this element of the lost profits test.

22

*See Pure Power Boot Camp*, 2011 WL 4035751, at *21 (holding that lost profits were not in the contemplation of the parties where contract was silent on issue and the plaintiff failed to introduce evidence suggesting that the parties contemplated such damages); *Spheronomics Global Contact Ctrs.*, 427 F. Supp. at 252; *Shred-It USA, Inc. v. Bartscher*, 2005 WL 2367613, at *12 (holding that lost profits were not in the contemplation of the parties since the plaintiff failed to make any showing on this issue).

### 2.    Breach of Fiduciary Duty Claims

The Court also finds that Plaintiffs have not established their entitlement to lost profits in connection with their breach of fiduciary duty claims.  Plaintiffs cite no case law in support of this theory.  Although lost profits may be awarded for a breach of fiduciary duty, in cases such as this involving improper competition by employees, the lost profits are generally limited to the losses sustained on the actual diverted accounts.  *See Paz Sys. v. Dakota Group Corp.*, 514 F. Supp. 2d 402, 410 (E.D.N.Y. 2007); *Royal Carbo Corp. v. Flameguard, Inc.*, 645 N.Y.S.2d 18, 20, 229 A.D.2d 430 (2d Dep't 1996).  Moreover, the causal link between the lost profits and the defendants' actions must be proven "with certainty."  *Am. Fed. Group, Ltd. v. Rothenberg*, 136 F.3d 897, 912-13 (2d Cir. 1998) (remanding case to magistrate judge to make findings on whether there was a causal link between plaintiffs' lost profits and defendant's actions).  As discussed above, Plaintiffs have not demonstrated that Defendants actually diverted any client accounts, nor have they established that Defendants caused the lost profits they seek to recover or made any attempt to reasonably apportion the lost profits between the two Defendants.

*    *    *

For all of the foregoing reasons, the Court respectfully recommends that Plaintiffs be

23

awarded no lost profit damages.

**B.   Net Losses**

Plaintiffs also seek $1,355,263 in actual losses sustained by New Wave in 2007 and 2008. Pls' Mem. at 8.  The Court recommends that this item be rejected as it was not sought in a timely manner.  In contemplation of the Inquest Hearing, the Plaintiffs were directed to provide the Court, on notice to the Defendants, with a breakdown of the specific categories and amounts of damages they were seeking by August 12, 2011. DE 114.  The first time the Court and Defendants learned of the net losses claim was at the Inquest Hearing on October 27, 2011, after the time for Defendants to submit their opposition had expired.  The Court also notes that this item appears to be duplicative of the $725,513 Plaintiffs are claiming as an investment they had to make in New Wave in 2007 and 2008 in that Plaintiffs are attempting to recover for both New Wave's losses and also the amounts they infused into New Wave to cover those losses.

Even if this item had been timely presented, the Court would retain its recommendation to reject this claim.  First, Plaintiffs did not submit any documentation reflecting the basis for this number other than Pls.' Ex. 2, which is not in evidence.  Likewise, there is nothing in the Form 10K or Form 10-KSB filed by Juniper Group for 2007 and 2008, Pls.' Ex. 5 and 6, that substantiates this amount.  *See* Tr. at 46-47, 51.  The Court brought to the attention of Plaintiffs' counsel that in the materials submitted prior to the Inquest Hearing as well as in Exhibit 2, Plaintiff had not provided a single piece of paper as back-up documentation for the categories described by Mr. Hreljanovic (e.g., "Advance to Corp.").

Moreover, Mr. Hreljanovic testified that from the time Michael Calderhead left the company until New Wave filed for bankruptcy in 2008 – a period of some 18 months – Plaintiffs

24

did not bring in another manager to replace him. *Id*. at 108-110. Instead, Mr. Hreljanovic, who did not have any direct involvement in the wireless construction business prior to Juniper's acquisition of New Wave, ran the business. *See id*. at 20. On cross-examination, Mr. Hreljanovic reasoned that there was "nobody of [Michael Calderhead's] caliber," so the Plaintiffs did not have anyone to replace him. *Id*. at 108. From the perspective of a CEO, the Court finds this rationale somewhat questionable, particularly in view of Plaintiffs' simultaneous operation of its subdivision, Ryan Pierce, and another West Coast subdivision engaged in similar work, Tower West. *Id*. at 108, 123. At the very least, that decision by management begs the question whether the failure of New Wave after the Calderheads' departure can be solely attributed to the Defendants. A party injured by a breach of contract "bears an obligation to make reasonable efforts to mitigate damages and failure to do so may cause a court to lessen the recovery." *APL Co. PTE Ltd. v. Blue Water Shipping U.S. Inc.*, 592 F.3d 108, 111 (2d Cir. 2010); *accord H. Morris & Partners, Ltd. v. Alfin, Inc.*, 234 A.D.2d 56, 56, 650 N.Y.S.2d 201 (1st Dep't 1996) (holding that plaintiff was not entitled to full value of contract absent evidence of its attempts to mitigate damages after defendant's breach). By not actively seeking to replace Michael Calderhead, whom Mr. Hreljanovic described as being key to the business, Tr. at 20-21, Plaintiffs failed to mitigate their damages.

### C. Destruction of Business Damages

Plaintiffs also seek damages in the form of: (1) $725,512.87 in funds invested by Plaintiffs in New Wave after Defendants departed in order to keep it operational ($539,500 in 2007 and $186,012.87 in 2008); (2) $327,563 in costs associated with the seizure of New Wave

equipment by the sheriff after New Wave filed for bankruptcy[5]; and (3) $21,437.36 in legal fees incurred by Tucker/Hester, New Wave's bankruptcy counsel.  *See* Lerner Aff. ¶ 4.g; Pls.' Mem. at 10-11.  Since all of these items relate to costs incurred by Plaintiffs as a result of New Wave's failure, they are adressed together.

Plaintiffs do not discuss the legal theory upon which their claim for these items is based. Courts have awarded damages for similar items under a so-called "destruction of business" theory provided the plaintiff can demonstrate that the acts complained of actually caused the destruction of the business and that the damages are not the result of some intervening cause. *See Nat'l Market Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 530 (2d Cir. 2004) (affirming district court's refusal to award damages associated with total demise of company where the plaintiff failed to prove that the defendant caused the company to go completely out of business); *24/7 Records, Inc.v. Sony Music Entm't, Inc.*, No. 03-CV- 3204, 566 F. Supp. 2d 305, 317 (S.D.N.Y. 2008) (stating that party seeking destruction of business damages must prove that damages were caused by the defendants' breach); *Dupont Flooring Sys., Inc. v. Discovery Zone, Inc.,* No. 98-CV-5101, 2004 WL 1574629, at *6 (S.D.N.Y. July 14, 2004) (holding that in order to recover damages for destruction of business, a plaintiff must prove that the destruction was directly traceable to defendants).

As with the lost profits damages, Plaintiffs have not established causation.  Given Plaintiffs' failure to hire new management after Defendant Michael Calderhead left, and James

---

[5]     In Plaintiffs' initial submission, they sought $1,000,377 for this category of damages.  *See* Lerner Aff. ¶ 4.d.  At the Hearing, Mr. Hreljanovic testified that while the equipment cost $1,000,377, the depreciated value of the equipment at the time it was seized was $327,563.  Tr. at 75.  Plaintiffs are therefore only seeking $327,563.  Pls.' Mem. at 11.

Calderhead was terminated, Plaintiffs' argument that Defendants' actions were the sole cause of the demise of New Wave is significantly weakened.  The Court thus finds that destruction of business damages are inappropriate here.

The Court also finds that there is insufficient evidence to support a damages claim for the $725,513 investment by Juniper in New Wave.   Plaintiffs originally sought $432,720 for this category of damages.  *See* Lerner Aff. ¶ 4.c.  The Inquest Hearing was the first time the Court was made aware that Plaintiffs were seeking $725,513.00.  Plaintiffs have not provided a satisfactory explanation for the disparity in these figures or for the delay in bringing the latter amount to the Court's and Defendants' attention, nor have they provided any back-up documentation.  Furthermore, the only support for the $725,513 amount is Mr. Hreljanovic's testimony because the Excel spreadsheets Plaintiffs submitted to support that amount, specifically Plaintiffs' Exhibits 2, 7, and 8, were not entered into evidence.  Mr. Hreljanovic testified that the $725,513 was needed to cover expenses such as payroll, petty cash, lodging, fuel and payments to various unspecified "vendors."  Tr. at 61-73.  Other than simply referring to such items, Plaintiffs did not enter into evidence any documents or business records showing such expenditures.  Mr. Hreljanovic's testimony regarding this basis for the $725,513 infusion of funds into New Wave was not sufficiently detailed to support an award for damages.

For the foregoing reasons, the Court respectfully recommends that Plaintiffs be awarded no destruction of business damages.

**D.    Punitive Damages**

Plaintiffs urge the Court to award punitive damages in this case because Defendants' actions "rise to the level of moral culpability which justifies a finding of punitive damages . . . ."

27

Lerner Aff. ¶ 6.  Plaintiffs do not specify whether they seek punitive damages in conjunction with their breach of contract claims or their breach of fiduciary duty claims, but the discussion of punitive damages in the Lerner Affirmation references both claims.  The Court finds that punitive damages are not warranted in conjunction with the breach of contract claims, but recommends that punitive damages be awarded in connection with Plaintiffs' breach of fiduciary duty claim against Defendant Michael Calderhead.

### 1.  Breach of Contract

Under New York law, "[p]unitive damages are not recoverable for an ordinary breach of contract as their purpose is not to remedy private wrongs, but to vindicate public rights." *Rocanova v. Equitable Life Assurance Soc'y of the U.S.*, 83 N.Y.2d 603, 613, 612 N.Y.S.2d 339 (1994).  Thus, in a breach of contract case, punitive damages are only available if the plaintiff can demonstrate not only egregious tortious conduct, but also that such conduct was part of a pattern of similar conduct directed at the public generally.  *Id.*; *3801 Beach Channel, Inc. v. Shvartzman,* No. 05-CV-0207, 2010 WL 6471990, at *14  (E.D.N.Y. Sept. 30, 2010); *ConocoPhillips v. 261 East Merrick Road Corp.*, 428 F. Supp. 2d 111, 128-29 (E.D.N.Y. 2006). Plaintiffs' Complaint does not meet this standard and contains no allegations that Defendants directed their conduct at the public generally.

### 2.  Breach of Fiduciary Duty

Unlike breach of contract claims, punitive damages are permitted under New York law for claims involving a breach of fiduciary duty by a disloyal employee.  *See Pure Power Boot Camp*, 2011 WL 4035751, at *27.  In order to obtain punitive damages, a plaintiff must demonstrate one of the following: "intentional or deliberate wrongdoing, aggravating or

outrageous circumstances, a fraudulent or evil motive, or a conscious act that willfully and wantonly disregards the rights of another." *Id*.

### a.   *James Calderhead*

The Court finds that there is no basis for imposing punitive damages on James Calderhead.  Plaintiffs have not meet their high burden in establishing the propriety of punitive damages here.  The Court also relies on evidence adduced at the Preliminary Injunction Hearing to support this conclusion, which the Court is free to.  *See Fustok v. ContiCommodity Servs., Inc.*, 873 F.2d 38, 40 (2d Cir. 1989) (noting with approval the district court's reliance, in assessing damages against a defaulting party, on "detailed affidavits and documentary evidence, supplemented by the District Judge's personal knowledge of the record, gained during four years of involvement with the litigation, including his role as presiding judge at trial"); *Group III Capital, Inc. v. Parasol Group, Ltd.*, No. 00-CV-6860, 2003 WL 1948801 (S.D.N.Y. April 23, 2003) (relying on all of the parties' submissions, including affidavits, declaration, and exhibits in case as well as Court's knowledge gained in the more than 2.5 years the action was pending in determining damages to be awarded against defaulting defendant).

This Court has been directly involved in the oversight of this case since its inception.  In its prior Report and Recommendation, the Court concluded that there was no evidence that James Calderhead solicited any New Wave clients or employees or misappropriated any of New Wave's trade secrets or other proprietary information.  *Id*. at 74, 78.  In addition, the Court found credible James Calderhead's testimony at the Preliminary Injunction Hearing that he had never worked for CII or had an ownership interest in that company and that his brother's untimely departure from New Wave caused a rift between the two of them since he did not approve of his brother's

29

actions.  *Id*. at 75-76.  Plaintiffs have not put forth any evidence that would suggest that the

conclusions reached by the Court at the Preliminary Injunction Hearing were or are incorrect, nor

have they put forth any additional evidence of James Calderhead's wrongful conduct since the

Preliminary Injunction Hearing.  Although a default judgment has been entered, the Court cannot

ignore the record established in this case, and the record does not establish that James

Calderhead's conduct warrants the imposition of punitive damages.  *See Fustok*, 873 F.2d at 40.

### b.     Michael Calderhead

This Court does find that punitive damages are warranted against Defendant Michael

Calderhead in conjunction with his breaches of the fiduciary duty he owed New Wave as his

employer.[6]  The law governing the duties an employee owes his or her employer were

summarized by this Court in the Report and Recommendation regarding the preliminary

injunction.  DE 16 at 13-14, 53-55.  As explained by the New York Court of Appeals:

> Fundamental to [the employer-employee] relationship is the
> proposition that an employee is to be loyal to his employer and
> is prohibited from acting in any manner inconsistent with his
> agency or trust and is at all times bound to exercise the utmost
> good faith and loyalty in the performance of his duties.

*Western Elec. Co. v. Brenner*, 41 N.Y.2d 291, 294, 392 N.Y.S.2d 409 (1977).  In addition, both

the Second Circuit and New York courts have held that an employee "has a duty 'not to use

confidential knowledge acquired in his employment in competition with his principal.'" *ABKCO*

---

[6]     Although punitive damages for breach of fiduciary duty are appropriate in this
case, the Court notes that, as other courts in this circuit have observed, *Giblin v. Murphy*,  73
N.Y.2d 769, 536 N.Y.S.2d 54 (1988), the sole case cited by Plaintiffs on this point, was decided
before the seminal New York Court of Appeals decision in *Rocanova* and is no longer good law.
*See ConocoPhillips*, 428 F. Supp. 2d at 129; *Cerveceria Modelo, S.A. v. USPA Accessories LLC*,
No. 07-CV-7998, 2008 WL 1710910, at *7 n.5 (S.D.N.Y.  April 10, 2008).

*Music Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 994 (2d Cir. 1983) (quoting *Byrne v.*

*Barrett*, 268 N.Y. 199, 206 (1935)).  Such a duty "exists as well after the employment as during

its continuance." *Id.*; *see also B.U.S.A. Corp. v. Ecogloves, Inc.*, No. 05-CV-9988, 2006 WL

3302841, at *5 (S.D.N.Y. Jan. 31, 2006).

In the Court's Report and Recommendation regarding the preliminary injunction, the

Court found that Michael Calderhead improperly retained proprietary information belonging to

New Wave and misappropriated New Wave trade secrets.  DE 16 at 55, 56.  The Court further

found that immediately after leaving New Wave, Michael Calderhead went to work for CII, a

direct competitor of New Wave and that Michael Calderhead had met with the principal of CII in

2006 regarding employment with CII.  *Id.* at 24, 63.  Moreover, Michael Calderhead

acknowledged that during his employment with New Wave, he signed a contract on behalf of

New Wave enabling fellow employee Tyson Burris to purchase wi-fi equipment in the amount of

$17,000 – equipment that was never deployed for New Wave's benefit.  *Id.* at 23.  These facts are

consistent with the scheme alleged in the Complaint – that Michael Calderhead was competing

with New Wave while employed there and improperly used New Wave's proprietary

information.

There was also evidence that Michael Calderhead acted willfully and in disregard of the

rights of Juniper.  Notably, the Court found credible a Juniper employee's testimony that Michael

Calderhead told him that he planned to tell other New Wave employees "that they had an

opportunity to go to work for him - to go to work with him."  DE 16 at 22.  The Court also

credited that employee's testimony that he was willing to work for a competitor of New Wave

because he had to "feed his family."  *Id.*

31

Courts have found that punitive damages are appropriate in similar cases where an employee improperly competes with his or her employer. *See Pure Power Boot Camp,* 2011 WL 4035751, at *28-30; *Wrap-N-Pack, Inc. v. Kaye*, 528 F. Supp. 2d 119, 126-27 (E.D.N.Y. 2007).

Although Plaintiffs did not specify the amount of punitive damages they were seeking as directed by the Court's July 22, 2011 Order, DE 114, the Court may nevertheless fashion an appropriate award. "'Under New York law, the imposition of punitive damages is left to the sound discretion of the finder-of-fact.'" *Pure Power Boot Camp,* 2011 WL 4035751, at *27 (quoting *Mar Oil, S.A. v. Morrissey,* 982 F.2d 830, 844 (2d Cir. 1993)). In *Pure Power Boot Camp*, the court awarded punitive damages against disloyal employees in the amount of two times the forfeited salary awarded as compensatory damages for one employee and an amount equal to the forfeited salary for another employee. *Id*. Here, Plaintiffs did not present the Court with evidence of Michael Calderhead's salary and it is not set forth in the Stock Exchange Agreement. However, in fashioning a remedy here, the Court is mindful that Juniper paid $225,000, along with a stock exchange, to purchase New Wave. In its discretion, then, the Court respectfully recommends that Plaintiffs be awarded punitive damages from Michael Calderhead in the amount of the cash portion of the purchase of New Wave, namely $225,000. *Id*., Ex. F § 2.1. The Court is mindful of the fact that Michael Calderhead was not the sole owner of New Wave at the time of the sale. However, the $225,000 is being awarded as punitive damages here, not breach of contract damages, and is an amount the Court finds appropriate taking all circumstances into account.

32

### E.    Attorney's Fees

In addition to the Tuker/Hester fees discussed above, Plaintiffs seek "legal fees" for the services of three other law firms that represented them in various capacities.

Plaintiffs state that Barnes & Thornburg represented them as local counsel in Indiana "in this action," *see* Lerner Aff. ¶ 4.f., although the firm has not entered an appearance. Plaintiffs have submitted detailed invoices from Barnes & Thornburg reflecting $98,095.12 in legal fees charged by that firm. Plaintiffs also seek fees for services rendered by Lerner, Arnold & Winston, LLP and Heller, Horowitz & Feit, P.C. Lerner, Arnold & Winston, LLP are counsel of record for Plaintiffs in this action. Heller, Horowitz & Feit, P.C. represented Plaintiffs in this action until January 24, 2008 when Judge Spatt granted them leave to withdraw as counsel. *See* DE 54. Plaintiffs have submitted detailed invoices which reflect fees totaling $82,222.25 and $98,095.12 charged by Lerner, Arnold & Winston, LLP and Heller, Horowitz & Feit, P.C. respectively. *See* Lerner Aff. ¶ 4.e., h.

The Court is required to follow state law in regard to an award of attorney's fees here. *See Alyeska Pipeline Serv. Co. v. Wilderness Soc.*, 421 U.S. 240, 259 n.31 (1975) ("state law denying the right to attorney's fees or giving right thereto, which reflects a substantial policy of the state, should be followed") (internal quotations omitted). New York follows the so-called "American Rule" under which "each party is to bear its own costs of litigation, unmitigated by any fee-shifting exceptions." *See Arbor Hill Concerned Citizens Neighborhood Ass'n v. Co. of Albany*, 522 F.3d 182, 186 (2d Cir. 2008). "Thus, absent a statutory obligation, an enforceable contractual obligation, or a situation involving 'willful disobedience of a court order,' litigants generally pay their own attorney's fees. *Billion Tower Int'l, LLC*, 2010 WL 5536513, at *10

33

(denying request for attorney's fees in damages inquest) (quoting *Aleyska*, 421 U.S. at 247, 258);

*see also Watermelon Express, Inc. v. Marine Park Farmer's Market*, No. 05-CV-4649, 2007 WL

4125111, at *5 (E.D.N.Y. Sept. 14, 2007) (same).

There are no facts in this case which warrant a departure from the American Rule.

Notably, neither the Stock Exchange Agreement nor the Employment Agreement contains a fee-

shifting provision.  Prior to the Inquest Hearing, Plaintiffs' counsel provided no case law to

support Plaintiffs' claim for attorney's fees, despite this Court's specific direction to provide

"[a]ny case law supporting the specific item or type of damages" claimed.  *See* DE 114 at 2.  In

his post-hearing memorandum, counsel for Plaintiffs states the following:

> While the general rule is that legal fees are only recoverable if they
> are set forth in a contract or a statute, Plaintiffs concede that both the
> Employment Agreement and the Stock Exchange Agreement are
> silent on a parties [sic] right to legal fees in the event of a breach by
> the other.  They are also unaware of any controlling statute that would
> impose an award of legal fees based on the facts of this case.

Pls.' Mem. at 12.  While acknowledging these facts, Plaintiffs nevertheless argue that they are

entitled to attorney's fees because Defendants "intentionally took away clients and business from

New Wave to the point where it forced its bankruptcy."  *Id*.  As noted previously, despite a

default, Plaintiffs must still prove their damages.  They have not proven their entitlement here.

Plaintiffs argue for the first time in their post-hearing memorandum that attorney's fees

should be awarded as "consequential" or "special" damages, stating that attorney's fees "are

precisely the type of 'consequential' or 'special' damages the *East Coast Resources* [c]ourt was

alluding to."  *Id*.  However, *East Coast Resources*, *LLC v. Town of Hempstead*, 707 F. Supp. 2d

401 (E.D.N.Y. 2010) does not suggest that a party may obtain attorney's fees simply by

34

categorizing them as "consequential" or "special" damages.  The *East Coast Resources* court set forth the circumstances in which a party may recover special damages for a breach of contract in addition to general damages, *i.e.*, where they are reasonably foreseeable at the time the contract was entered into.  The court did not, however, mention attorney's fees or allude to the possibility of recovering them as consequential damages.  Plaintiffs' statement that their request is "justified by the well settled law of this jurisdiction,"  Pls.' Mem. at 13, is inaccurate.  Plaintiffs' attempt to obtain attorney's fees under the label of punitive damages, *see id.*, is similarly unsupported and unavailing.

For the forgoing reasons, the Court finds that Plaintiffs have not established their entitlement to attorney's fees in the circumstances of this case and I respectfully recommend to Judge Spatt that no attorney's fees be awarded.

## V.    CONCLUSION

Based upon the foregoing information, I respectfully recommend to Judge Spatt that Plaintiffs be awarded $225,000 in punitive damages as against Defendant Michael Calderhead. The Court respectfully recommends that no damages be awarded as against Defendant James Calderhead, nor for lost profits, net losses, destruction of business, or any attorney's fees for either Defendant.  Plaintiffs are also entitled to post-judgment interest "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System for the calendar week preceding[] the date of the judgment."  28 U.S.C. § 1961(a).

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure,

the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections.  *See also* Fed. R. Civ. P. 6(a) and (e).  Such objections shall be filed with the Clerk of the Court via ECF.  A courtesy copy of any objections filed is to be sent to the chambers of the Honorable Arthur D. Spatt, and to the chambers of the undersigned.  Any requests for an extension of time for filing objections must be directed to Judge Spatt prior to the expiration of the fourteen (14) day period for filing objections.  Failure to file objections will result in a waiver of those objections for purposes of appeal.  *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Beverly v. Walker*, 188 F.3d 900, 901 (2d Cir. 1997), *cert. denied*, 522 U.S. 883 (1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).


     **Counsel for the Plaintiffs is directed to serve a copy of this Report and Recommendation on the Defendants forthwith by regular mail and overnight mail and to file proof of service on ECF by Monday, February 20, 2012.**


                                   **SO ORDERED.**


Dated: Central Islip, New York
       February 16, 2012

                                   /s/ A. Kathleen Tomlinson
                                   A. KATHLEEN TOMLINSON
                                   U.S. Magistrate Judge